FILED
2012 Jun-06  PM 04:06
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | |
|---|---|
| DOROTHY FOLSOM, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| vs. ) | Case No.  7:09-cv-01486-HGD |
| ) | |
| MCABEE CONSTRUCTION, INC., ) | |
| ) | |
| Defendant ) | |

## REPORT AND RECOMMENDATION

The above-entitled civil action is before the court on the motion for summary judgment filed by defendant.  (Doc. 36).  The parties have submitted briefs and evidentiary submissions, and the matter is now ready for disposition.  (Docs. 36, 41, 42 & 43).

In her complaint, plaintiff Dorothy Folsom alleges that she was subjected to a sexually hostile work environment that was so severe and pervasive it affected the terms and conditions of her employment.  (Doc. 1, Complaint).  She seeks relief pursuant to Title VII of the Civil Rights Act of 1962, as amended.  Plaintiff also alleges that she was terminated as a result of her complaints about this harassment. She asserts that this action was retaliation in violation of Title VII.  (*Id.*).

In addition to plaintiff's claims under Title VII, she alleges that she was subjected to outrageous treatment. She further alleges that her employer negligently retained individuals who harassed her and that it negligently supervised and trained its employees and supervisors concerning sexual harassment, which resulted in damage to her. (*Id.*).

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The recently amended Rule 56(c) provides:

(1) **Supporting Factual Positions.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) **Objection That a Fact Is Not Supported by Admissible Evidence.** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) **Materials Not Cited.** The court need consider only the cited materials, but it may consider other materials in the record.

> (4) **Affidavits or Declarations.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed.R.Civ.P. 56(c). Defendant, as the party seeking summary judgment, bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). A genuine issue of material fact is shown when the nonmoving party produces evidence so that a reasonable factfinder could return a verdict in its favor. *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007). If the nonmoving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552. In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter; the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor. *Tipton v.*

*Bergrohr GMBH–Siegen*, 965 F.2d 994, 998-99 (11th Cir. 1992) (internal citations and quotations omitted).  However, speculation or conjecture cannot create a genuine issue of material fact.  *Cordoba v. Dillard's, Inc*., 419 F.3d 1169, 1181 (11th Cir. 2005).  A "mere scintilla of evidence" in support of the nonmoving party also cannot overcome a motion for summary judgment. *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004).

## FACTUAL BACKGROUND

Dorothy Folsom was an employee of McAbee Construction (McAbee).  McAbee is an industrial contractor based in Tuscaloosa, Alabama.  McAbee has a number of "core" employees that actually work for McAbee, including Bryan Casdorph, a General Superintendent over the Cedar Springs operation, and Steve Long, the Safety Officer at Cedar Springs.  Other employees, including ironworkers, mill workers and laborers, are hired from the appropriate labor union on an as-needed basis.

Folsom worked for McAbee during three short-term temporary work assignments.  Her first employment began on October 15, 2007, and lasted slightly more than a week.  Her job assignment as a laborer was as a fire watcher. (*Id.* at 101). Her duties were to observe when welding, grinding or work where "anything with a

spark" is involved and to sound an alert if anything caught on fire during the process. (Casdorph Depo. at 25).

Folsom was a member of the Atlanta Laborers Local Union. (Casdorph Depo. at 33). There was no interview by McAbee before Folsom was first hired. She was sent over by the labor union. (*Id.* at 44). According to the labor contracts between McAbee and the unions, the union sent over individuals it had determined were qualified. (*Id.*; Sexton Depo. at 71-74). However, the McAbee General Superintendent at the Cedar Springs site, Bryan Casdorph, was allowed to request a certain number of specific union members to be sent over when workers were sought from the union. In some instances, he could request up to 50% of the union members sent over to perform work at Cedar Springs. (Casdorph Depo. at 55).

During her first period of employment with McAbee, Folsom worked at Mead Coated Board in Cottonton, Alabama. During the second period of employment, she worked for about a week, from October 31 until November 5, 2007, at the Georgia Pacific facility in Cedar Springs, Georgia. (*Id*. at 125-26). At the end of that period, she was laid off due to lack of work. (*Id.* at 131; Folsom Depo. at Def. Ex. 1). Folsom had no problems and was not harassed during her first two periods of employment with McAbee. (Folsom Depo. at 102, 134).

Each time Folsom was hired by McAbee, she signed an acknowledgment form stating that she had received a copy of McAbee's General Safety Practice Booklet and that she had read and understood it. (Folsom Depo. at Exs. 1, 2 and 3). This booklet contained the McAbee Construction No Harassment Policy and directed that violations of this policy should be brought to the attention of Leah Ann Sexton or Wendell McAbee, and a phone number was provided for reaching both of these individuals. (Folsom Depo. at Ex. 4). In 2008, this booklet was green in color. (Sexton Depo. at 22). Both Sexton and McAbee are part owners of McAbee Construction and work out of the company's main office in Tuscaloosa, Alabama.

According to Folsom, when she was first hired, she was given "a little green book" by McAbee employee Debbie Sutton to sign and return. (Folsom Depo. at 86-87). Folsom states she was told to "hurry up and sign it so we can get on, because we was fixing to leave for the day." (*Id.* at 116). She was not allowed to keep the book, and no one at McAbee discussed the contents of the book or McAbee's harassment policy, other than to have her sign it and turn it back in. (*Id.* at 86-87, 94-95). Folsom asked for a copy of the book, but was told by Sutton that she (Sutton) had to keep it on file. (*Id.* at 130). Folsom never observed any posters or signs posted regarding sexual harassment. (*Id.* at 97-98).

When Folsom was rehired in late October 2007, she was again told to sign the book and turn it back in.  (*Id.* at 109).  She did not read the book, although she signed a statement stating that she had done so.  (*Id.* at 115).  On this occasion, she again asked to keep the book, but was told that it had to stay with the company.  (*Id.* at 117-19, 129).

On April 2, 2008, Folsom went back to work for McAbee a third time, at Cedar Springs.  (*Id.* at 120).  Again, Folsom was directed by Debbie Sutton to sign the book and turn it back in.  Folsom again asked to keep the book, but Sutton told her that she had to keep it.  (*Id.* at 129, 144).  According to Folsom, she did not read the book because she was told to hurry up and sign it because she had to get to the job site.  (*Id.* at 143).  There were no signs up around the Cedar Springs plant concerning policies against sexual harassment or discrimination.  (*Id.* at 145).

When she arrived at the job site, George Morgan, a crew foreman, came up and told her she was on his crew.  (*Id.* at 160).  Chris Morgan, George's son, was also a member of this crew.  According to Folsom, she began to have problems with Chris Morgan shortly after she began work with this crew.  Folsom testified that "[o]n a day-to-day basis, he would ask me to go fuck."  (*Id.* at 164).  When asked how often this occurred, she stated:  "Every day, something new with him every day.  If he wasn't asking me to go fuck, he would show me pictures on his phone of a penis

being pierced, with piercings in it.  And then the next day he would show me another picture, this girl with an apple in her butt."  (*Id.*).

On some occasions when Chris Morgan would ask to have intercourse with Folsom, George Morgan was present.  When George Morgan heard these remarks, he did not do anything except laugh.  (*Id.* at 172-73, 176).  Folsom testified that she asked George to make his son "shut up."  His response was to laugh.  (*Id.* at 176).

Folsom stated that she would tell Chris to "get it out of my face" and that she "didn't appreciate it."  (*Id.* at 165).  Folsom stated that she understood that she was to report any safety or other problems to Steve Long, and she reported the harassment she was receiving from Chris Morgan to Steve Long.  (*Id.* at 176-77).  She reported Chris's harassment "[a]bout every three or four days and every day after the hammer incident."  (*Id* at 179).

According to Folsom, on April 9, 2008, she bent over to pick up an extension cord when Chris came up behind her and "jabbed a hammer between [her] legs."  (*Id.* at 179).  George Morgan was present when this occurred.  (*Id.*).  Folsom testified:  "I was stunned.  I told him he had no business doing that.  Then he turns around and puts the hammer between his legs acting like–he said, look a here, this is how long my dick is and it is hard, are you ready to fuck.  And he started walking toward me with the hammer."  (*Id.* at 180).  Folsom looked over at George Morgan who "[said]

yes, his dick really is that long. . . ." (*Id.* at 181).  She told Chris that she did not

appreciate this and stated that the whole incident was "really embarrassing." (*Id.* at

181).

Folsom reported this incident to Steve Long the next day. (*Id.* at 182-83).

Long laughed and said "okay," but he did not take any action. (*Id.* at 183).  She also

went looking for Bryan Casdorph to report the incident to him, but he was not at his

office. (*Id.* at 184).  She eventually saw Casdorph and reported this incident to him.

She asked Casdorph to "have a talk with Chris Morgan and ask him to quit harassing

me."  He laughed and said "uh-huh, okay." (*Id.* at 188-89).  Long also told her he

would "tend to it." (*Id.* at 243).  Folsom did not report these incidents to anyone other

than Steve Long and Bryan Casdorph. (*Id.* at 194).

After this incident, Chris Morgan continued to ask Folsom "when are we going

to fuck." (*Id.* at 185).  According to Folsom, "[i]t was just an every day thing, and

then he would talk about his bitches and whores, how he would get down with them

in the car." (*Id.* at 191).  She gave as an example an occasion where Chris told her

that "last night I was riding in the car, I was driving and my bitch, she unzipped my

pants and sucked my dick." (*Id.*).  Folsom told Chris that she did not want to hear

about this. (*Id.*).  Folsom testified that this occurred on a daily basis, including lunch

break.  She testified that she "got sick and tired of him talking about his bitches and

whores and when are we going to fuck. I couldn't even eat." She began eating apart from the crew. (*Id.* at 192).

Eventually, George Morgan told her she was being transferred to a crew of pipefitters. According to Folsom, Long transferred her because she kept complaining about Chris Morgan. The foreman of this group, "Randy," asked her for a date, but she refused. However, she testified that there were no inappropriate sexual advances by Randy. (*Id.* at 244-45).

Folsom also claims that she was subjected to sexual harassment by Steve Long on two occasions. According to Folsom, on the day she was hired in April 2008, she went to his office to pick up some ear plugs and gloves. When she went in the office, Long said he wanted to see her breasts, raised her shirt and bra up and grabbed her left breast. (*Id.* at 196-97). She told him, "You're not supposed to be doing this." She then returned to her work crew. She never reported this incident to anyone, saying it was "embarrassing." (*Id.* at 198-200).

She also testified that, on another occasion when she went into Steve Long's office to get ear plugs, he told her she was just the right size to fit under his desk and give him a blow job. (*Id.* at 215). Folsom states that she turned around and left Long's office without saying anything in response. (*Id.* at 216).

On another occasion, a co-worker identified only as "Hank" asked her to get naked with him behind the Coke machine. She refused. Only she and Hank were present during this incident. (*Id.* at 227).

However, on another occasion, Folsom states that she had to ride in a pickup truck with five men and had to sit in Hank's lap. She claims that George Morgan and Chris Morgan were also in the truck and that she got in the truck at the direction of George to go to a job site. (*Id.* at 230-32). During the ride, Hank was "going up and down" with her in his lap when someone stopped them and yelled "hey, I want on your crew so she can sit in my lap too." (*Id.* at 233-34).

Folsom states that she told the others that this was uncalled for and that she would appreciate it if it did not happen again. (*Id.* at 234). Folsom states that she did not report Hank to anyone because George Morgan had been right there and had seen it. (*Id.* at 235).

Likewise, Folsom claims that sometime in May 2008, Bryan Casdorph called her into his office, ostensibly to get a telephone number from her. As she was writing the number down at his desk, he reached over and grabbed her breasts. (*Id.* at 200-01).

Folsom acknowledges that, before working for McAbee, she was employed for a short period of time as a dancer at the Runway Club, a "bikini club" in Dothan. She

danced and occasionally performed lap dances.  (*Id.* at 234-35; Casdorph Depo. at 136).

Folsom's last day of work at McAbee was May 28, 2008.  She had a doctor's appointment on May 29, 2008, and emergency gallbladder surgery on May 30.  She told Steve Long about having the appointment and later provided him a note from her doctor.  (Folsom Depo. at 252).  Later, she provided a second note from her doctor, indicating that she would be off from work for six weeks.  (*Id.* at 258).  On June 5, 2008, Folsom received notice that she had been laid off.  (*Id.* at 255).  According to Folsom, "[t]hey hired some woman when they laid me off."  (*Id.* at 259).  Had she not been laid off, Folsom would have been unable to return to work for the six-week period that her doctor had ordered her to stay off from work.  (*Id.* at 286).

Folsom testified that she believed that she was laid off for complaining about harassment.  However, the only evidence she has of this is the fact of her layoff.  (*Id.* at 272).  She has called to see about going back to work at McAbee, but she has not been rehired because she owe dues to the union.  According to Folsom, the union said it would consider her for work as soon as she paid her dues.  (*Id.* at 276).

Bryan Casdorph testified that he is the General Superintendent at McAbee.  (Casdorph Depo. at 6).  As General Superintendent, he is in charge of everything on site that has to do with McAbee.  According to Casdorph, that means, "anything that

has to do with McAbee:  personnel, dealing with the customers, quality, safety.
Anything that pertains to McAbee.  Ordering material, equipment, information." (*Id.*
at 7-8).  All foremen and stewards report directly to Casdorph.  At Cedar Springs, this
included Steve Long in Safety.  (*Id.* at 8-9).

The number of employees at Cedar Springs varied from week to week.  At the
time that Folsom was hired, McAbee was building up to a "shutdown."  As it got
closer to shutdown, it was necessary to hire more people.  A "shutdown" is where the
plant shuts down for a period to allow for maintenance to be performed.  All of the
paper-making equipment and the process related to this are shut down.  In this
instance, the period of shutdown was from June 2 to June 21, 2008, with some
continuing until June 26.  (*Id.* at 10-11).

During the time of Folsom's employment at Cedar Springs, from April 2 to
May 28, 2008, she worked as a laborer performing fire watch.  (*Id.* at 12).  The
number of fire watchers employed by McAbee varied from day to day.  There were
several others who performed this job at Cedar Springs during this time, in addition
to Folsom.  (*Id.* at 26-28).

After Folsom left, McAbee hired 14 more fire watchers on June 2, 2008.  (*Id.*
at 28).  This group of fire watchers was laid off between June 14 and June 26.  (*Id.*
at 31).  Two fire watchers were female:  Brenda Jackson and Brenda Louis.  (*Id.* at

29-30).  They worked for McAbee until the end of June 2008, between the 21st and the 26th, although Casdorph is not certain whether they were in the group of 14 hired on June 2.  Of the employees who were working as fire watchers before the June 2 hiring, at least two, Calvin Harris and Derry Robinson, continued to work after the end of June.  (*Id.* at 32).

The labor foreman at Cedar Springs was John Jerry.  He would make job assignments for the fire watchers, with Casdorph's approval.  (*Id.* at 34).  However, if an assigned fire watcher was needed elsewhere, a craft foreman, such as the pipefitter's foreman, could move the employee without permission from Jerry.  (*Id.* at 35).

George Morgan was the ironworker foreman.  Ironworkers on the site performed welding jobs.  At Cedar Springs, this included welding iron to columns to make them stronger.  Fire watchers were used while this was being done.  (*Id.* at 36).

According to Casdorph, he had no problems with Folsom's job performance when she was there.  However, he had problems with her attendance in April and May.  According to Casdorph, Folsom missed three or four consecutive days without calling in on one occasion.  She then called in to say that she had been out with her son because he had dental work performed and she was taking care of him.  (*Id.* at 37).  Casdorph testified that he did not discipline Folsom for this, but he did talk to

her about it.  Folsom missed around ten days of work in April and May.  However, for some of the missed days, she had notes from her doctor or a law firm she had gone to see.  (*Id.* at 39-40).

At the end of her employment, Folsom had gallbladder surgery.  She never came back to work after the surgery.  Folsom advised that her doctor would not be releasing her to return to work for six to eight weeks.  She was advised that the shutdown job would be finished in three to four weeks.  (*Id.* at 41).  McAbee continued to use fire watchers for a time after the shutdown was completed, but none were being used at that location at the time of Casdorph's deposition (June 10, 2010).

Casdorph first came to know Folsom when he hired her to work at Cedar Springs from October 31 to November 5, 2007.  (*Id.* at 43).  There was no interview process because they were qualified by virtue of their status as union members.  (*Id.* at 45-46).  Casdorph calls the union business agent and tells him how many employees he needs.  The business agent then sends them out.  However, Casdorph has the right to request a certain number of specific union members for a job, usually up to 50%.  (*Id.* at 55).

According to Casdorph, he is involved in the on-site hiring and orientation process, but it changes from day to day.  He was not involved in the process with Folsom.  He believes that was done by either Debbie Sutton or Steve Long.  He does

not know what information or material was given to her or what she may have signed at the time she was hired.  (*Id.* at 45).

According to Casdorph, only one female employee at Cedar Springs has ever complained about harassment.  (*Id.* at 64).   In June of 2008, Brenda Lewis complained that she was being required to do work without assistance that she was unable to do alone.  Other employees refused to help her stack some crossties, telling her that pipefitters were not going to do a laborer's work.  (*Id.* at 64-67).  When Casdorph confirmed that her complaint was true, he terminated the employees involved.  (*Id.* at 68).

Casdorph stated that one of these employees was due to be laid off at the end of the week.  After he terminated that employee, he did not change the paperwork to reflect that he had been fired.  Casdorph was later reprimanded for not making this change.  (*Id.* at 70-71).

According to Casdorph, McAbee has provided him with training with regard to sexual harassment.  The first time was approximately eight years prior to the date of his deposition.  (*Id.* at 104).  The training took place in Tuscaloosa, but the exact venue changed from year to year.  (*Id.* at 105).  Casdorph states that he was trained on "what to do and what not to do when dealing with people" and that it was "wrong to mistreat or discriminate against anybody for something that they have no control

over, whether it's the color of their skin, their age, their disability." (*Id.* at 106).

Likewise, he was told not to keep calendars of "half-dressed women in bathing suits"

and to "watch your language around people, treat people with respect." (*Id.* at 107).

Long did not attend sexual harassment training held by McAbee in 2007 or

2008. (Sexton Depo. at 45-46). The sexual harassment training is scheduled every

year in Tuscaloosa. (Casdorph Depo. at 107). In general, it is the same training every

year. (*Id.* at 114). However, there were times when Casdorph did not make it to the

training session. (*Id.* at 112). He states that he may have "missed a meeting or two."

He could not recall if he went to the training session in 2008. (*Id.* at 113). However,

he identified his signature on the sign-in sheet for that year. (*Id.* at 148). It is

provided to employees who work directly for McAbee. (*Id.* at 108). Employees who

are hired out at the job site do not go through the sexual harassment training, other

than their orientation "when we go over the employee handbook." (*Id.* at 110).

However, he has no knowledge of what Folsom may have gone through when she was

hired because he was not present. (*Id.* at 110).

According to Casdorph, employees hired to work at the job site, like Folsom,

come in when they are hired and sign a copy of the employee handbook. They are

given a copy that they can take home. (*Id.* at 115-16). Casdorph testified that he

keeps copies of the employee handbook on the hiring table in the front of the office

trailer. (*Id.* at 117). Although he now reads the employee-conduct portion of the employee handbook to new employees, he did not do this before Folsom's suit. He relied on others to do this. (*Id.* at 156). He has no knowledge of what was covered with Folsom when she was hired. (*Id.* at 156-57).

Casdorph stated that, if an employee complains to a foreman of sexual discrimination, the foreman is supposed to report it to him. (*Id.* at 119-20). If this occurred, Casdorph stated that he would "take care of it." He would "go find the person that's making the accusation, talk to them, find out what happened, and then I go to the people that – that's being accused, and I go talk – find out their side of the story." However, he did not write anything down. (*Id.* at 120).

Casdorph stated that he never had to talk to Chris Morgan about his performance or the way he treated people. However, he did talk to him about cursing. (*Id.* at 122-23). Chris Morgan is not currently employed by McAbee. According to Casdorph, in order to be rehired, Chris would have to be in good standing with the union. He believes that Chris has dropped out of the union, which would make him ineligible for employment by McAbee. (*Id.* at 123).

Steve Long testified that he also was involved in the orientation of newly-hired employees. However, he has no specific knowledge of being involved in the orientation of Folsom when she was hired. (Long Depo. at 20). Long testified he is

not aware of any woman who worked at Cedar Springs who complained of sexual harassment.  (*Id.* at 64).

<h3 align="center">DISCUSSION</h3>

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  In evaluating Title VII claims based on circumstantial evidence, the court uses the framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and by the Eleventh Circuit in *Willis v. Conopco, Inc.*, 108 F.3d 282, 284-85 (11th Cir. 1997).  Under that framework, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence.  *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 253-54 & n.6, 101 S.Ct. at 1093-94 & n.6.  Once a *prima facie* case has been established, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the challenged employment action.  *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094.  If a defendant carries its burden of producing legitimate, non-

discriminatory reasons for its decision, the plaintiff is accorded the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. The plaintiff at all times retains the ultimate burden of persuading the trier of fact that the employer discriminated against the plaintiff. *Id.* at 253, 101 S.Ct at 1093.

> The "factual inquiry" in a Title VII case is "whether the defendant intentionally discriminated against the plaintiff." *Burdine, supra*, at 253, 101 S.Ct., at 1093. In other words, is "the employer . . . treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), quoting *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335, n.15, 97 S.Ct. 1843, 1854, n.15, 52 L.Ed.2d 396 (1977). The *prima facie* case method established in *McDonnell Douglas* was "never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco, supra*, 438 U.S., at 577, 98 S.Ct., at 2949. Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant. The district court has before it all the evidence it needs to decide whether "the defendant intentionally discriminated against the plaintiff." *Burdine, supra*, 450 U.S., at 253, 101 S.Ct., at 1093.

*U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983).

**Sexually Hostile Work Environment Claim**

The Eleventh Circuit set forth in *Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999) (*en banc*), the elements that an employee must establish to support a hostile environment claim under Title VII based on harassment.  An employee must establish:  (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.  *Id.* at 1245.[1]

The fourth element–that the conduct complained of was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment"–is the element that tests the mettle of most sexual harassment claims. Requiring a plaintiff to prove that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment is necessary to ensure that Title VII does not become a mere

---

[1] Plaintiff has satisfied three of the element  she belongs to a protected group; she was subjected to unwelcome sexual harassment by Chris Morgan; and the harassment was based on her sex.

"general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283-84, 141 L.Ed.2d 633 (1998). This requirement is regarded "as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace–such as male-on-male horseplay or intersexual flirtation–for discriminatory 'conditions of employment.'" *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998)).

In order to establish this factor, a plaintiff must not only establish that she subjectively perceived the environment as hostile and abusive, but also that such a perception is objectively reasonable; that is, that a reasonable person would perceive the environment to be hostile and abusive. *See Mendoza*, 195 F.3d at 1246; *Faragher*, 524 U.S. at 788, 118 S.Ct. at 2284 (explaining that the objective component of the "severe and pervasive" element prevents "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" from falling under Title VII's broad protections (citation omitted)).

If the complained-of statements and conduct are of a gender-related or sexual nature, there are four factors that are considered in determining whether they are sufficiently severe and pervasive from an objective standpoint to alter an employee's

terms or conditions of employment:  "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  *Mendoza*, 195 F.3d at 1246.

Folsom testified that she found the harassment that she was subjected to, especially by Chris Morgan, to be hostile and abusive.  Although Folsom previously worked at a "bikini club" and performed lap dances, she did not testify that she was subjected to constant requests for sexual favors or conduct that was otherwise demeaning and humiliating when she was so employed.  Thus, her environment was subjectively hostile.

With regard to the objective component, a plaintiff must show more than the "mere utterance of an . . . epithet which engenders offensive feelings in an employee" to establish a violation of Title VII.  *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986).  The Supreme Court held in *Faragher*, 524 U.S. at 788, that "offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  In *Gupta*, the Eleventh Circuit noted that:

> [a]ll the sexual hostile work environment cases decided by the Supreme
> Court have involved patterns or allegations of extensive, long lasting,

unredressed and uninhibited sexual threats or conduct that permeated the plaintiff's work environment.

*Gupta*, 212 F.3d at 586 (quoting *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir. 1999)).

According to the testimony of plaintiff, the conduct she was subjected to met at least three of the four factors set out in *Mendoza, supra.* According to Folsom, Chris Morgan subjected her to daily doses of sexual harassment. Thus, the conduct was frequent. The conduct was not subtle. Morgan was constantly wanting to know when they could "fuck." Thus, the conduct was severe. Some of the incidents, such as the incident where the hammer was placed between her legs, were physically threatening and humiliating. Although Folsom testified that she was able to continue to perform her job functions despite the harassment, she found it necessary to eat lunch by herself in order to escape Morgan's constant harassment.

Consequently, plaintiff has made a *prima facie* showing that her work environment was one wherein she was subjected to severe and pervasive sexual harassment by Chris Morgan. However, even as to Chris Morgan, the inquiry does not end here. The method of analyzing employer liability in harassment cases is governed by the United States Supreme Court's decisions in *Burlington Industries,*

*Inc. v. Ellerth*, 524 U.S. 742, 751, 118 S.Ct. 2257, 2264, 141 L.Ed.2d 633 (1998), and *Faragher, supra.*

The extent of an employer's liability for discriminatory or harassing conduct by an employee depends, to a great degree, on the status of the employee within the company.  For instance, when a non-supervisory employee harasses a co-employee, then, if the harassment is such that the employer knew or should have known that it was occurring, the employer is liable for the harassment unless it took prompt action to remedy the problem.  *See Ellerth*, 524 U.S. at 751, 118 S.Ct. at 2264; *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1368 (11th Cir. 1999).  In other words, the employer is liable for employee-on-employee harassment only if it is negligent in discovering or failing to promptly remedy the problem when it comes to its attention. *Ellerth*, 524 U.S. at 758, 118 S.Ct. at 2267.

Chris Morgan was a co-employee, not a supervisor.  However, according to the testimony of Folsom, she complained to her foremen, George Morgan, the Cedar Springs Safety Officer, Steve Long, and the General Superintendent, Bryan Casdorph, about the conduct of Chris Morgan.  No action was taken against him.  Although McAbee had a no-harassment policy in place, Folsom testified that she was never made aware of it.  She admits signing a statement stating she had read and understood the contents of the employee handbook, including the no-harassment policy.

However, she further testified that this was untrue and that she was required to sign it and turn it back over to McAbee without having the opportunity to read it. In addition, she testified that she requested that she be allowed to keep the handbook and was told that she had to turn it back in.

In addition, although Casdorph received some training regarding sexual harassment, no employees hired through the union to work at Cedar Springs received any such training or information other than that contained in the employee handbook. Casdorph testified that when foremen receive complaints of harassment, they are supposed to bring it to his attention so that he can investigate it. Casdorph was never notified of any complaints by Folsom which she claims she made to George Morgan and Steve Long. It is undisputed that George Morgan was Folsom's supervisor. Although Long was not a supervisor, it was his job to make sure that the job site was a safe place to work. Likewise, it is undisputed that Casdorph was in charge of all operations at McAbee's Cedar Springs operation, yet no action was taken with regard to Folsom's complaints.[2] Consequently, there is evidence that, while McAbee had a no-harassment policy, it was ineffective or dysfunctional in its application at Cedar

---

[2] The Court realizes that defendant asserts that there were no incidents of sexual harassment and that Folsom never complained about any of the incidents she testified to at her deposition. However, for purposes of summary judgment, the testimony of the non-movant is to be believed unless it is undisputably contradicted by other evidence.

Springs.  *Cf. Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1299 (11th Cir. 2000) (where there is no evidence that an employer adopted or administered an anti-harassment policy in bad faith or that the policy was otherwise defective or dysfunctional, its existence militates strongly in favor of a conclusion that the employer exercised reasonable care to prevent and promptly correct sexual harassment) (internal citations and quotations omitted).  As a result, plaintiff has established *prima facie* evidence that McAbee was negligent in discovering or failing to promptly remedy the problem when it came to its attention.  *Ellerth*, 524 U.S. at 758, 118 S.Ct. at 2267.  Therefore, she has established a *prima facie* case of a sexually hostile environment with regard to the actions of Chris Morgan.

The rules are different if the harassing co-worker is also a supervisor.  If the harasser is a supervisor but the harassment has not resulted in "tangible job action," then the employer may nevertheless be held liable if the harassment is sufficiently severe and pervasive to alter the terms and conditions of employment, subject to an affirmative defense set out below.  *Ellerth*, 524 U.S. at 751, 118 S.Ct. at 2264.  On the other hand, if the supervisor's harassment has resulted in a tangible job action, the employer is vicariously liable for the supervisor's actions and no affirmative defense is available.  *Faragher, supra.*

That affirmative defense "comprises two necessary elements:  (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807, 118 S.Ct. at 2293; *Ellerth*, 524 U.S. at 765, 118 S.Ct. at 2270.

Even assuming that Bryan Casdorph, Steve Long, George Morgan and Hank Ready are supervisors, plaintiff has not shown that the incidents of harassment that she claims she was subjected to by Casdorph (grabbing a breast on one occasion), Long (pulling up her shirt and bra on one occasion and suggesting that she perform oral sex on another), Morgan (requiring her to sit in the lap of a co-worker while traveling in a pickup truck to a job site), or Ready[3] (asking her to get naked behind the Coke machine) are sufficiently severe or pervasive to constitute sexual harassment.  Nor has she shown that she was subjected to any tangible job action as a result of this harassment.  Although the actions recounted by plaintiff were undoubtedly annoying and offensive, many decisions throughout the circuits have rejected sexual harassment claims based on actions that are as serious or more serious than the conduct at issue here.  *See Shepherd v. Comptroller of Public Accounts of*

---

[3]  Plaintiff did not know Hank's last name, but other witnesses provided the last name.

*Texas*, 168 F.3d 871, 872-75 (5th Cir. 1999) (holding that several instances over a two-year period, including the comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, touching plaintiff's arm, and attempts to look down the plaintiff's dress, were insufficient to support a hostile environment claim); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (holding that statement that plaintiff had the "sleekest ass" in the office plus a single incident of "deliberately" touching plaintiff's "breasts with some papers that he was holding in his hand" were insufficient to alter the terms or conditions of plaintiff's employment); *Adsumilli v. City of Chicago*, 164 F.3d 353, 357 (7th Cir. 1998) (holding actions insufficient to support a hostile environment claim where co-employees teased plaintiff, made sexual jokes aimed at her, asked her what "putting one rubber band on top and another on the bottom means," commented about her low-neck tops, repeated staring at her breasts with attempts to make eye contact, and four incidents of touching her arm, fingers or buttocks); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365-66 (10th Cir. 1997) (holding five sexually-oriented, offensive statements over 16 months insufficient to show hostile environment, even though one of the harasser's statements occurred while he put his arm around plaintiff, looked down her dress and said, "well, you got to get it when you can."); *Hopkins v. Baltimore Gas & Electric Co.*, 77 F.3d 745, 753-54 (4th Cir. 1996)

(holding evidence that the harasser "bumped into [the plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding, and stared at him in the bathroom" insufficient to establish Title VII violation); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 823-24 (6th Cir. 1997) (reversing jury verdict and finding conduct was "sex-based" but insufficiently severe or pervasive to state actionable claim, where conduct over a four-month period involved repeated sexual jokes; one occasion of looking plaintiff up and down, smiling and stating, there's "Nothing I like more in the morning than sticky buns"; suggesting that land area be named as "Titsville" or "Twin Peaks"; asking plaintiff; "Say, weren't you there [at biker bar] Saturday night dancing on tables?"; stating, "Just get the broad to sign it"; telling plaintiff she was "paid great money for a woman"); *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993) (holding plaintiff's claims supervisor repeatedly asked about her personal life, told her how beautiful she was, asked her on dates, called her a dumb blond, put his hand on her shoulder at least six times, placed "I love you" signs in her work area, and tried to kiss her once in a bar and twice at work, were not sufficient for actionable sexual harassment).

Consequently, the acts by Casdorph, Long, George Morgan and Hank Ready, while certainly objectionable, do not constitute actionable sexual harassment because

they were not sufficiently severe and pervasive, nor did they substantially interfere with plaintiff's job performance.[4]  Because these acts do not rise to the level of actionable sexual harassment, the issue of the applicability of the *Faragher* defense is moot.  Consequently, it is unnecessary to determine with respect to these allegations whether McAbee had an effective no-harassment policy in place of which employees were or should have been aware or whether Folsom unreasonably failed to avail herself of the remedies available under that policy.

**Retaliation Claim**

Plaintiff also alleges that she was terminated from her employment at McAbee as a result of her complaints of sexual harassment.  In order to establish a *prima facie* case of retaliation under Title VII, a plaintiff must prove the following elements: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision.  *Gupta*, 212 F.3d at 587.

It is undisputed that plaintiff had emergency gallbladder surgery on May 30, 2008, and that she thereafter reported to McAbee that her doctor wanted her to stay off from work for six to eight weeks.  She states that since she has recovered from her

---

[4] These acts may be evidence of the tolerance for sexual harassment at Cedar Springs, though they are not actionable by themselves.  However, this is an evidentiary matter for trial, not summary judgment.

surgery, she has wished to return to employment at McAbee but has not been hired for any positions.  However, she also acknowledges that she owes union dues to her union and that she has been instructed that she would be eligible to be placed at a job when she pays her dues.

Furthermore, the evidence presented reflects that the "shutdown" operation at Cedar Springs was completed by June 26, 2008.  Although there are some employees who were retained after that date, there is no evidence that anyone was hired after plaintiff became eligible (after recovery from surgery) to return to work. In fact, there is no evidence that Folsom is eligible to return to work even now.  She acknowledges that she has not paid her union dues and that the union has advised her that she must pay her dues to be referred to a job.

The evidence reflects that McAbee hires pursuant to union contracts that it has with various unions, including the one where Folsom is a member.  In order to be sent to a job, one must be approved by the union.  Although Casdorph had the right under the contract to select up to 50% of the union personnel sent out to a job site, he had to select union members.  Consequently, because plaintiff was not a paid-up union member, she was not available for placement at Cedar Springs after her recovery.

In any event, it is undisputed that she was laid off after she reported that she would be unable to return to work until after the anticipated end of the job at Cedar

Springs.  Therefore, assuming plaintiff made complaints regarding sexual harassment and was terminated, she has, nonetheless, failed to demonstrate that there is a causal connection between the two.  According to McAbee, she was laid off because it was anticipated she could not return to work until the job was over.  In fact, according to the record evidence, all employees hired by McAbee are laid off when there is no longer any work for them to do.  Simply because Folsom was laid off in anticipation of her being unable to return before the job was completed does not establish the necessary causal connection.  As noted above, while others continued to work after the shutdown, there is no evidence that anyone was hired for a position similar to Folsom's.  Therefore, Folsom has failed to establish a *prima facie* case of retaliation.

**State Law Claims**

### I. Outrage

To establish the tort of outrage, the plaintiff must show:  (1) that the defendant intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was "extreme and outrageous"; and (3) that the actions of the defendant caused the plaintiff emotional distress so "severe" that no reasonable person could be expected to endure it.  *Am. Road Serv. Co. v. Inmon*, 394 So.2d 361, 365 (Ala. 1981).  *See also U.S.A. Oil, Inc. v. Smith*, 415 So.2d 1098, 1100 (Ala.Civ.App. 1982).  The Alabama

Supreme Court has defined extreme conduct as "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Potts v. Hayes*, 771 So.2d 462, 465 (Ala. 2000).   The tort will not reach conduct that amounts to "mere insults, indignities, threats [or] annoyances." *McIsaac v. WZEW-FM Corp.*, 495 So.2d 649, 651 (Ala. 1986).   The Alabama Supreme Court has limited the instances in which a claim for the tort of outrage should lie. *See Potts*, 771 So.2d at 465 ("The tort of outrage is an extremely limited cause of action.").   Indeed, the Alabama Supreme Court has recognized the tort in only three types of cases: (1) those arising out of wrongful conduct in the family-burial context, (2) those arising out of "barbaric methods employed to coerce an insurance settlement," and (3) those arising out of "egregious sexual harassment." *Id.*

The cases in which a claim of outrage has survived a motion for summary judgment involved allegations of egregious sexual harassment. *See Henry v. Georgia-Pacific Corp.*, 730 So.2d 119 (Ala. 1998); *Busby v. Truswal Sys. Corp.*, 551 So.2d 322 (Ala. 1989); *Brewer v. Petroleum Suppliers, Inc.*, 946 F.Supp. 926 (N.D.Ala. 1996); *Brassfield v. Jack McLendon Furniture, Inc.*, 953 F.Supp. 1438 (M.D.Ala.1996).

In *Henry*, the plaintiff's employer required that she (and all employees) attend counseling sessions with a counselor hired by the employer.  In her counseling sessions, the plaintiff was hypnotized, asked questions about her orgasms, and asked to take off her shirt.  Upon reporting her experience to her supervisor, she was told that she had to continue seeing the counselor or she would be fired.  The court, with little discussion, found that "a jury could reasonably determine that [the defendants'] conduct was outrageous."  *Henry*, 730 So.2d at 121.

The plaintiffs' supervisor in *Busby* subjected them to a laundry list of indignities, including inviting the plaintiffs to swim nude with him, telling the plaintiffs that he would "put a stick on their machines" so that they could masturbate, expressed his wish to the plaintiffs that they come to work braless and with less clothing, telling a plaintiff that she could do her work if she had not stayed up all night having sex, acted as if he were going to pinch one plaintiff's breasts with pliers and his hands, telling a plaintiff that he was going to send her across the street to where men were standing because she stayed sexually aroused, asking an employee to accompany him to the restroom to hold his penis because he was very tired, telling another plaintiff that her nipples were as large as another woman's breasts, following one plaintiff to the bathroom and saying he was going to help her, and on and on. *Busby*, 551 So.2d at 324.

*Brewer* involved a supervisor who repeatedly touched the plaintiff, verbally harassed her, and threatened to rape her.  *Brewer*, 946 F.Supp. at 929.

In *Brassfield*, the court denied summary judgment and retained an outrage claim because the plaintiff suffered "continuous" and "opprobrious" sexual harassment. *Brassfield*, 953 F.Supp. at 1453.  The harassment, however, included one of the company's officers asking to have his shoulders rubbed before he would answer work-related questions, calling the plaintiff salesperson his "market wife" in front of visiting sales representatives, asking the plaintiff to perform oral sex on him, asking her to have sex with him, or intimating something of a sexual nature on a daily basis, including asking her to have a *menage a trois* and to have sex in someone's office, asking her to go skinny dipping with him numerous times, kissing her hand and arm without permission, rubbing himself against her, commenting in front of other salespersons that she probably liked being spanked when she had sex, and expressing that he liked her dress because he could see her "tits" when she bent over. *Id.* at 1445, 1447.

In this case, the allegations against Chris Morgan are that he constantly subjected plaintiff to requests for sexual favors, showed her photographs of genitals, described sexual relations he had engaged in with others and physically assaulted her by placing a hammer between her legs and then claiming it was equal in size to his

penis.  Under the circumstances as alleged by plaintiff, summary judgment is not

appropriate as to this claim.

## II.  Negligent Retention, Supervision, and Training

Plaintiff further alleges that McAbee negligently retained Chris Morgan,

George Morgan, Steve Long, Hank Ready and Bryan Casdorph after she was

subjected to harassing conduct and that it ratified and/or condoned the sexual

harassment of the plaintiff.  (Doc. 1, Complaint, at ¶ 43).  She also alleges that

McAbee negligently supervised and negligently trained its employees and supervisors

both before and after she voiced complaints about the sexually harassing conduct and

that it ratified and/or condoned the sexual harassment of plaintiff.  (*Id.* at ¶ 49).

In *Potts v. BE & K Constr. Co.*, 604 So.2d 398 (Ala. 1992), the Alabama

Supreme Court stated that an employer is liable for the intentional torts[5] of its agent

---

[5]   As a general rule, under Alabama law, an independent cause of action for sexual harassment does not exist and, thus, the alleged sexual harassment alone cannot be the underlying tort necessary for plaintiff's negligent hiring, training, supervision and retention claim.  *Stevenson v. Precision Standard, Inc.*, 762 So.2d 820, 824-25 (Ala. 1999).  However, the Alabama Supreme Court has recognized a sexual harassment exception to the requirement that a common law tort must underlie a negligent hiring, training, supervision, and retention claim.  The exception provides that "the manner in which a sexual-harassment complaint is handled when sexual harassment has, in fact, occurred can form the basis for a claim for negligent or wanton supervision" when the handling of the complaint did not cause the harassment to cease or caused it to only temporarily cease. *Stevenson v. Precision Standard, Inc.*, 762 So.2d 820, 825 (Ala. 1999); *see also Patterson v. Augat Wiring Sys., Inc.*, 944 F.Supp. 1509 (M.D.Ala. 1996); *Machen v. Childersburg Bancorporation, Inc.*, 81 FEP Cases 815 (Ala. 1999); *Mardis v. Robbins Tire & Rubber Co.*, 669 So.2d 885 (Ala. 1995); *Big B, Inc. v. Cottingham*, 634 So.2d 999, 1003-04 (Ala. 1993).  Thus, even if plaintiff's outrage

(1) if the wrongful acts were committed in the line and scope of the agent's employment; or (2) if the acts were taken in furtherance of the business of the employer; or (3) if the employer participated in, authorized or ratified the wrongful acts.  In order to show that the employer either implicitly "ratified" or "tolerated" sexual harassment by one of its employees, the Court stated that, in addition to proving the underlying tortious conduct of an offending employee, a complaining employee must show that his or her employer

> (1) had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take "adequate" steps to remedy the situation.

*Id.* at 400.

In *Big B, Inc. v. Cottingham*, 634 So.2d 999 (Ala. 1993), the Alabama Supreme Court recognized a cause of action for negligent or wanton supervision and training. That cause of action was predicated on the underlying tortious conduct of an employee, an assistant manager who at trial admitted wrongdoing.  In *Big B*, the assistant manager forced a customer to engage in a sex act with him, after he detained

---

claim were due to be dismissed, her claim of negligent retention, supervision and training could go forward if she can meet this standard.

the customer and accused her of shoplifting.  A suspected shoplifter who was an acquaintance of the customer and who had entered the store with her had escaped from the store.  The assistant manager took the customer to a back room, accused her of participating in the theft, demanded the name of her acquaintance, and threatened to file criminal charges against her unless she engaged in a sexual act with him.  The customer sued, seeking to recover damages from the assistant manager and from Big B.  Her claims alleged assault and battery and false imprisonment against the assistant manager and against Big B based on the doctrine of *respondeat superior*, and also alleged negligent or wanton training and supervision against Big B.  The Alabama Supreme Court, affirming a judgment against Big B, held that a jury question existed as to whether Big B had negligently supervised and/or trained its assistant manager, by (1) failing to investigate properly an earlier accusation of sexual harassment against the assistant manager and (2) failing to review the store's training manuals with the assistant manager or to otherwise train him as to the proper manner in which he was to detain and question suspected shoplifters.

Similarly, plaintiff asserts that she informed her immediate supervisor, George Morgan, Safety Officer Steve Long, and General Superintendent Bryan Casdorph of the continuous harassment she suffered from Chris Morgan, and, based on this, they knew or should have known that such conduct constituted sexual harassment, and that

none of them did anything to address her complaints of harassment. In addition, she alleges that McAbee failed to adequately train line supervisors on handling sexual harassment complaints both before and after she complained of the harassment and that, as a result, the harassment by Chris Morgan went unchecked.

Under the circumstances as alleged here, plaintiff has established a *prima facie* case of negligent training, supervision and retention. Therefore, summary judgment is not appropriate as to this claim.

### CONCLUSION

Based on the foregoing, it is RECOMMENDED that defendant's Motion for Summary Judgment be GRANTED as to plaintiff's claim of retaliation. It is further RECOMMENDED that defendant's Motion for Summary Judgment be DENIED as to plaintiff's claim of sexual harassment/sexually hostile environment and state law claims of outrage and negligent training, supervision and retention.

### NOTICE OF RIGHT TO OBJECT

The parties are DIRECTED to file any objections to this Report and Recommendation within a period of fourteen (14) days from the date of entry. Any objections filed must specifically identify the findings in the magistrate judge's recommendation objected to. Frivolous, conclusive, or general objections will not be considered by the district court.

Failure to file written objections to the proposed findings and recommendations of the magistrate judge's report shall bar the party from a *de novo* determination by the district court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE this 6th day of June, 2012.

_____
HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE